**********
The undersigned have reviewed the prior Decision and Order based upon the record of the proceedings before Deputy Commissioner Taylor and the briefs and arguments of the parties. The appealing party has shown good ground to reconsider the evidence. Accordingly, the Full Commission modifies the Decision and Order of Deputy Commissioner Taylor regarding causation and damages.
 **********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as: *Page 2 
 STIPULATIONS
1. All parties are properly brought before the Industrial Commission, are subject to and bound by the provisions of the Tort Claims Act, the Commission has jurisdiction over the parties and of the subject matter.
2. All parties have been correctly designated, and there is no question as to misjoinder or nonjoinder of the parties.
3. Neither of the parties in this action is appearing in a representative capacity.
4. There are no third party defendants or cross-claimants.
5. This action was filed with the Commission pursuant to the provisions of the North Carolina Tort Claims Act, N.C. Gen. Stat. § 143-291 et seq., against the Department of Correction, which is a department of the State of North Carolina.
6. Plaintiff, Tareek Dubose, has alleged negligence on the part of Correctional Officer Ricardo Evans and Captain (now Assistant Superintendent) Katy Poole.
7. Defendant filed an Answer with the Commission denying all allegations of negligence.
8. At times relevant to this case, the individuals alleged in the Affidavit as negligent employees or agents of the State of North Carolina were in fact employees or agents of the State of North Carolina.
9. On or about March 24, 2004, plaintiff was an inmate in the North Carolina Department of Correction and was being transferred to Scotland Correctional Institution in Laurinburg, North Carolina. Plaintiff was transferred in a prison transfer van and was restrained in full restraints during the transfer, including leg chains, handcuffs, waist chain and black box. Upon arriving at Scotland Correctional Institution, plaintiff fell while fully restrained as he was *Page 3 
trying to climb down the steps to get out of the prison van. Plaintiff alleges he suffered injuries as a result of the fall. This is the incident that gave rise to this tort claim.
10. The following documents were stipulated into evidence without further need for authentication or verification:
 a. Stipulated Exhibit 1 — Pre-Trial Agreement and attached stipulated documents pages 1-760;
 b. Stipulated Exhibit 2 — Transcript of Dr. Viscardi deposition;
 c. Stipulated Exhibit 2A — DVD of Dr. Viscardi deposition;
 d. Stipulated Exhibit 2B — VHS of Dr. Viscardi deposition; and
 e. Stipulated Exhibit 2C — Court reporter documentation of correction to Dr. Viscardi deposition pg. 90.
11. The following documents were entered into evidence as Plaintiff's Exhibits
 a. 1a — Photograph of a Division of Prisons 15-passenger transport van;
 b. 2 — Evans diagram of sally port;
 c. 3 — Ricardo Evans deposition;
 d. 4 and 5 — Photographs (for illustrative purposes only);
 e. 6 — April 4, 2007 Clutier affidavit; and
 f. 7 — American Academy of Psychiatry and Law Ethical Guidelines.
 **********
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT *Page 4 
1. On March 24, 2004, plaintiff, Tareek Dubose, arrived into the receiving area of Scotland Correctional Institution in an inmate transfer van. Plaintiff was restrained in full restraints, including handcuffs, black box, waist chain, and leg irons or leg chains.
2. Full restraints limit the ability of an inmate to run, kick, or climb, and place an inmate in a vulnerable state, as the inmate cannot catch or brace himself in case of a fall. An inmate in full restraints has limited motion of only a few inches.
3. Correctional Officer Evans ordered plaintiff to get off of the van and then walked around the other side of the van to another vehicle to retrieve the inmates' records, which were necessary to properly process the inmates in the receiving area. In ordering plaintiff off the transfer van, Officer Evans did not verify that there was an officer there to assist plaintiff stepping off the van.
4. The Officer in Charge in the receiving area of Scotland Correctional Institution on March 24, 2004 was Captain (now Assistant Superintendent) Katy Poole. As Officer in Charge of the receiving area, it was her duty to either stand by the van as inmates exited it or assign another officer to do so.
5. There was no correctional officer present to assist plaintiff off of the transfer van, nor was there a correctional officer in a position close enough to plaintiff to catch him if he were to fall.
6. Neither Officer Evans nor Captain Poole assisted plaintiff while he was climbing down out of the transfer van or placed themselves in a position close enough to plaintiff to catch him if he were to fall.
7. The inmate transfer van had a metal step on the side of the van to allow inmates to climb down out of the van. *Page 5 
8. Plaintiff followed the instructions of Correctional Officer Evans and began to get off of the van. While he was trying to climb down out of the van, his leg irons got caught in the step of the van and he fell face first onto the concrete floor of the receiving area. Plaintiff was unable to brace himself or catch or even cushion his fall because he was in full restraints.
9. Plaintiff was discovered lying on his head on the concrete when Correctional Offices Evans came back around the van with the inmate records.
10. As a result of his fall, plaintiff suffered a blow to the left side of his forehead.
11. After the fall, plaintiff received medical attention for his minor injuries at Scotland Memorial Hospital emergency room and was released that night.
12. For several months after the fall, plaintiff experienced headaches and dizziness for which he requested and received medical care from the medical staff at the North Carolina Department of Correction. Several months after the accident, plaintiff began complaining of loss of vision in both eyes which he attributed to the March 24, 2004 fall.
13. On December 13, 2004, eight months after the incident, an eye test conducted by Department of Correction medical professionals indicated that plaintiff's vision was 20/20 in his right eye and 20/50 in his left eye. On April 27, 2005, more than a year after the accident, an eye test indicated that plaintiff had 20/200 in his right eye and 20/40 in his left eye but was able to read at 20/20 with both eyes.
14. On September 1, 2005, one year and nine months after the incident, plaintiff was seen by Dr. Robert Toler, an optometrist contracted by the North Carolina Department of Correction. Dr. Toler attended East Carolina University as an undergraduate for 3 ½ years without obtaining a degree then attended optometry school for four years. Dr. Toler does not *Page 6 
hold a medical degree. Dr. Toler has been the contract optometrist for the Department of Correction since 1983, shortly after he obtained his optometrist license.
15. Dr. Toler did not review plaintiff's medical records prior to his examination. Dr. Toler performed a visual acuity test that showed plaintiff's vision to be 20/400 in both eyes. After viewing plaintiff's optic nerves, Dr. Toler diagnosed plaintiff with presumed optic nerve pathway damage, an irreversible condition that causes permanent vision loss.
16. Dr. Toler was of the opinion that plaintiff suffered from permanent, progressive, uncorrectable vision loss which he diagnosed by observing plaintiff's optic nerve tissues. Dr. Toler opined that the fall out of the transfer van onto the concrete floor caused plaintiff's permanent, uncorrectable vision loss.
17. After being released from prison, plaintiff sought treatment at New York Hospital Queens Eye Center on May 5, 2006. An eye test conducted at that time showed plaintiff's vision to be less than 20/400 in both eyes. However, the ophthalmologist who examined plaintiff's optic nerves found no damage to them. Queens Eye Center referred plaintiff to a neuro-ophthalmologist but plaintiff sought no further treatment of his eyes.
18. Dr. Jeffrey Viscardi performed an extensive review of plaintiff's medical records. Dr. Viscardi is an ophthalmologist. He graduated from State University of New York with a medical degree and completed a three-year residency in ophthalmology. Dr. Viscardi is the chief of Division of Ophthalmology at East Carolina University School of Medicine and Chairman of the Ophthalmology Department at Pitt County Memorial Hospital.
19. Dr. Viscardi opined that plaintiff did not suffer from traumatic optic neuropathy. Dr. Viscardi based his opinion on plaintiff's past visual acuity tests and the normal optic nerve results found by the ophthalmologist at Queens Eye Center. Dr. Viscardi testified that the April *Page 7 
27, 2005 acuity test raised a red flag regarding plaintiff's vision as it is not possible to test 20/200 in one eye and 20/40 in the other eye and still see 20/20 with both eyes. If one eye cannot read 20/20 then both eyes together cannot read 20/20. Further, Dr.Viscardi testified that if one does suffer from traumatic optic neuropathy, the damage to the nerve is permanent and immediate. One's vision does not get better some days and get worse other days. Because plaintiff was able to read 20/20 in this right eye and 20/50 in this left eye eight months after the incident, Dr. Viscardi could not attribute plaintiff's vision loss to a traumatic injury to the optic nerve.
20. Greater weight is given to the opinions and testimony of Dr. Viscardi, an ophthalmologist, than that of Dr. Toler, an optometrist. Plaintiff did not suffer traumatic optic neuropathy as a result of the March 24, 2004 incident.
21. Correctional Officer Evans and Captain Poole owed plaintiff a duty to prevent plaintiff from being injured while in the custody of the Department of Corrections.
22. Officer Evans and Captain Poole breached their duty of care owed to plaintiff by failing to assist him and by failing to hold plaintiff or to be in a position to catch him when he began to fall while he was climbing out of the transfer van in full restraints.
23. As an actual and proximate result of this breach of duty, plaintiff sustained a lump on his head and headaches for which he received medical treatment. Plaintiff has not shown through the greater weight of the competent credible evidence that his alleged permanent vision loss actually or proximately resulted from the March 24, 2004 incident.
24. Plaintiff was damaged by the negligent actions of Officer Evans and Captain Poole.
 *********** *Page 8 
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. Under the provisions of the Tort Claims Act, negligence is determined by the same rules applicable to private parties. Bolkir v.N.C. State University, 321 N.C. 706, 709, 365 S.E.2d 898, 900 (1988). The general rule is that a prison official is liable when he knows of, or in the exercise of reasonable care, should anticipate danger to the prisoner and with such knowledge or anticipation fails to take the proper precautions to safeguard his prisoners. Taylor v. North CarolinaDepartment of Correction, 88 N.C.App. 446, 451, 363 S.E.2d 868, 871
(1988).
2. The named employees of defendant in this matter could reasonably have foreseen that plaintiff was in danger because he was in full restraints. Officer Evans and Captain Poole had a duty to protect plaintiff from foreseeable falls when he was climbing out of the transfer van while in full restraints and unable to catch himself. The officers breached this duty by failing to assist plaintiff out of the van, failing to hold onto plaintiff or to be in a position to catch him, and/or more closely assist plaintiff when he began to fall. Id.
3. Officer Evans and Captain Poole also had a duty to protect plaintiff against foreseeable harm. Id.
4. As a result of the negligence of Officer Evans and Captain Poole, plaintiff suffered a fall that resulted in a lump on plaintiff's head and headaches. The burden of proving damages is on the party seeking those damages. Olivetti Corp. v. Ames Business Systems, Inc.,319 N.C. 534,547, 356 S.E.2d 578, 586 (1987). Having shown that he was damaged by the *Page 9 
negligence of Officer Evans and Captain Poole, plaintiff is entitled to compensation under the Tort Claims Act. N.C. Gen. Stat. § 143-291.
5. Plaintiff has failed to prove that he suffers from traumatic optic neuropathy, much less that any alleged traumatic optic neuropathy is causally related to the March 24, 2004 incident. Therefore, plaintiff is not entitled to damages in relation to any alleged traumatic optic neuropathy. Olivetti Corp. v. Ames Business Systems, Inc., 319 N.C. 534,547, 356 S.E.2d 578, 586 (1987).
6. A reasonable sum to compensate plaintiff for his damages is $10,000.00.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 ORDER
1. Defendant shall pay compensatory damages in the amount of $10.000.00 to plaintiff as a result of its employees' negligence.
2. Defendant shall pay the costs.
This the 29th day of October, 2008.
S/___________________
DIANNE C. SELLERS *Page 10 
COMMISSIONER
CONCURRING:
 S/___________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
DISSENTING:
 S/___________________ DANNY LEE McDONALD COMMISSIONER *Page 11